# United States District Court
## Middle District of Florida
## Orlando Division

EDWARD P. LANE,

Plaintiff,

-vs-                                          Case No.  6:05-cv-1850-Orl-28DAB

JO ANNE B. BARNHART,
Commissioner of Social Security,[1]

Defendant.

_____

# Report And Recommendation

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument [2] on review of the Commissioner's denial of Plaintiff's application for social security disability benefits.  Upon review of the briefs, the administrative record and the applicable law, it is **respectfully recommended** that the decision be **REVERSED** and the matter be **REMANDED** for further proceedings.

## Procedural History

Plaintiff protectively filed applications for Social Security Disability Insurance benefits and Supplemental Security Income payments on January 23, 2003 (R. 13, 44-46, 249-252).  The applications were denied initially and upon reconsideration.  Plaintiff then requested and received a

---

[1]Jo Anne B. Barnhart became Commissioner of Social Security on November 9, 2001.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Jo Anne B. Barnhart should be substituted, therefore, for Paul D. Barnes, as the defendant in this suit.

[2]Although Plaintiff requested argument be held, in view of the clear error apparent in the record, the Court finds no need for same.

hearing before an Administrative Law Judge (herein "the ALJ") (R. 262-292).  By decision dated July

12, 2005, the ALJ found that Plaintiff was not disabled (R. 10-20).  This became the final decision

of the Commissioner when the Appeals Council denied Plaintiff's request for review (R. 4-6).

Plaintiff timely filed the instant action for review of that decision, and the matter is now ripe

under 42 U.S.C. §§ 405(g) and 1383(c).

### NATURE OF CLAIMED DISABILITY

Plaintiff claims disability from an amended onset date of August 24, 2001, due to

"uncontrolled diabetes, cardiac disease, uncontrolled HTN,[3] arthritis, lumbar fusion" and resulting

pain and limitations (R. 61, 264).

### Summary of Evidence Before the ALJ

At the time of the decision, Plaintiff was 57 years old, with a high school education and some

college, and past relevant work experience as an auto parts counter clerk (R. 14, 44, 67, 70-71).  It

appears that he stopped working in 1998 in order to care for his bedridden parents, and had planned

to return to work after his mother died in 2001, but he suffered a heart attack three weeks after her

death (R. 124, 271-2).  He had no insurance and no income at the time.

The relevant medical evidence[4] is set forth in the administrative record.  By way of summary,

Plaintiff suffered from herniated discs in the lumbar area in 1976 and underwent surgical spinal fusion

in 1977 (R. 73).  In August 2001, Plaintiff presented to the hospital complaining of severe chest pain

and underwent an off pump aortocoronary bypass times five, following a diagnosis of severe triple

---

[3]This is an abbreviation for hypertension.

[4]The ALJ found that Plaintiff was insured for disability insurance benefits only through December 31, 2001 (R. 14). As such, eligibility for such benefits is contingent on a finding that Plaintiff was disabled on or prior to that date.  No such limitation is present with respect to Plaintiff's SSI claim.

vessel disease, with left main component, and acute myocardial infarction (R. 127, 125).  Blood sugar testing while Plaintiff was in the hospital resulted in a diagnosis of diabetes (R. 119).

On September 26, 2001, in a follow-up visit with a cardiologist, Plaintiff's blood pressure was 150/90, and it was noted that Plaintiff's hypertension "was not doing as well as [the doctor] would like" (R. 150).  The record reveals that Plaintiff was taking Glucotrol XL, Lopressor, Restoril, OxyContin, Aspirin and Keflex. *Id.*  Plan was to add or adjust medications, follow up with blood tests and a stress test, begin cardiac rehab and Plaintiff was "advised to see a diabetes doctor." *Id.*

On October 25, 2001, Plaintiff underwent a low level exercise stress test (R. 152).  The test was terminated because of shortness of breath after one minute of stage 2 (total of four minutes).  It was noted that the test results were negative for chest pain or ischemic changes, but Plaintiff had "extremely poor exercise tolerance secondary to deconditioning." *Id.*  He was directed to pursue cardiac rehab.

On November 7, 2001, Plaintiff's cardiologist informed him that he was "no longer able to continue as your physician," and recommended that he find another cardiologist without delay (R. 149).  There is no evidence that Plaintiff did so, but the record includes a notation from Plaintiff that he made no further appointment because "no insurance/no money" (R. 93).

The next medical records in the file are from Oviedo Family Medical Center (R. 155-63).  On March 27, 2002, Plaintiff presented to the Center complaining of neck, low back and hand pain.  It was reported that he had been getting OxyContin, Lorcet and Xanax from "Dr. Mirza." (R. 163).[5]  On examination, his blood pressure was 150/100, and he was found to have decreased range of motion in his neck and shoulders.  Straight leg raising test was negative. Assessment was chronic lower back

---

[5]The Court notes that there are no records from Dr. Mirza in the file.

pain and degenerative joint disease of the neck and hands.  Plan was to obtain records from Dr. Mirza, and refill prescriptions.  *Id.*

On return visit on April 5, 2002, Plaintiff complained of shoulder pain and left side back pain (R. 162).  Plaintiff reported that had not been taking his medications, as he had been "feeling better." (R. 162).  Blood pressure was 150/100.  It does not appear that Plaintiff saw a physician on this visit, as no findings are noted and there is no physician signature on the form.

Three days later, on April 8, 2002, Plaintiff returned to the Center complaining of worsening neck and back pain, and saw a physician[6] (R. 161).  Plaintiff reported that he had been taking four OxyContin a day instead of three.  On examination, his range of motion in his neck was noted to be decreased, with tight muscles.  Decreased range of motion was also noted in his right shoulder.  Blood pressure was elevated at 158/108, but Plaintiff reported that he did not take his blood pressure medication that morning.  *Id.*  Assessment was degenerative joint disease of the neck, back and shoulder.  Plan was to increase the OxyContin, and prednisone was prescribed.  Plaintiff was to return in two weeks.  It was noted that Plaintiff had planned to go on a trip.

Plaintiff returned on April 23, 2002, complaining of neck and back pain, sinus congestion and arthritis, but reporting that he was feeling better as the steroids helped and he had started back on the blood pressure medication (R. 160).  It was noted that he "just came back from NY." *Id.*  Blood pressure was 110/70, and his neck examination was noted to be abnormal, with decreased range of motion.  Assessment was URI vs. allergies - resolving and chronic neck pain/ DJD [degenerative joint disease].

---

[6]The signature of the practitioner is illegible.

On return visit May 21, 2002, Plaintiff complained of hands, neck, low back pain and left knee pain (R. 159). Blood pressure was noted to be 130/100 and range of motion of the neck was again decreased. It was noted that a C-spine x-ray was positive for "mod-severe DJD." Assessment was chronic neck DJD/ hand DJD/ lumbar and knee DJD, anxiety and HTN. Plan was to refill the pain prescriptions and Xanax.

On return visit on June 17, 2002, Plaintiff's blood pressure was 170/110, although he stated that he had been taking his blood pressure medication (R. 158). Assessment was chronic neck, back pain and HTN. Medications were adjusted, and Plaintiff was to use a blood pressure monitor at home.

On return visit on July 12, 2002, Plaintiff's back pain was about the same, and he asked to be checked for diabetes (R. 157). His blood pressure was 150/96. His glucose level on an AccuCheck monitor was 149. Assessment was hyperglycemia, chronic back pain and hypertension. Plan was to go on the ADA 1800 calorie diet and exercise, and Plaintiff was to check his fasting glucose levels and blood pressure at home and bring the results to the next appointment.

Plaintiff returned to the Center on August 2, 2002, complaining that his back pain was worse, and his left leg was numb (R. 156). Blood pressure was 169/100. On examination, Plaintiff's range of motion for the lumbar spine was decreased, but SLR was negative. Assessment was DJD lumbar/DM[7] / HTN. Medication was adjusted, and Plaintiff was to have an x-ray of the lumbar spine, follow the ADA diet, and recheck his blood sugars.

On return visit August 29, 2002, it was noted that Plaintiff had not increased his blood pressure medication and had lost 2.5 pounds (R. 155). His blood sugar was 165 after eating, and it was noted that Plaintiff did not eat regularly. Blood pressure was 140/100 and his neck examination

---

[7]It is assumed this is a reference to diabetes mellitus.

was noted to be abnormal, with "exam unchanged." Assessment was DM/HTN/ Chronic neck and back pain.

Plaintiff presented to Dr. Donald Edwards of Pain Care First on October 4, 2002 (R. 189-190). His blood pressure was 186/120. In his initial evaluation, Plaintiff described daily continuous back, neck and hand pain (R. 189). He complained of depression and sleep problems, and it was noted that Plaintiff's dog died, he had lost his primary care M.D., and his "nerves [were] shot." (R. 190). On examination, he was alert and in no distress, with normal speech and gait. Assessment was status post CABG[8] x 5 (Sept 2001), AODM,[9] HTN, diffuse DJD-osteoarthritis, s/p spinal fusion, and insomnia (R. 190). Lab work and testing was ordered, and medications were prescribed or adjusted.

On return visit on October 29, 2002, Plaintiff's blood pressure was 160/100 and he reported that he had the flu for a week (R. 188). Blood tests were deferred, and Plaintiff was to take his medications and see an eye doctor.

On return visit on November 25, 2002, Plaintiff noted that he had been "stuck in NY" and just got back (R. 187). It was noted that the Soma that had been prescribed had "helped a lot" and Plaintiff "returned to work 1st time post CABG." Blood pressure was 184/110, but it was noted that Plaintiff missed his blood pressure medication that morning.

Plaintiff presented on December 16, 2002, complaining of severe tooth ache in his right lower jaw (R. 186). He was alert and coherent, in moderate distress and restless. Dr. Edwards noted that Plaintiff's blood pressure was "high again" at 180/110. Medications were renewed.

---

[8]It is believed that this refers to the coronary artery bypass graft.

[9]This is presumed to be Adult Onset Diabetes Mellitus.

On January 6, 2003, Plaintiff presented to Dr. Edwards that "he was almost completely blind now." (R. 185). The treatment notes contain an ambiguous entry that includes an arrow pointing downward next to the following notation: "sleeping pills a lot. works 10-12 hours a night. driver [or drives] to Miami area." (R. 185).[10] His blood pressure was 172/100, which was noted to be mildly lower. Plaintiff's continued visual difficulties were also noted.

On return visit on January 27, 2003, Plaintiff reported increased pain (R. 184). Blood pressure was 174/100, although Plaintiff noted that he takes his blood pressure medication daily. Plaintiff was noted to have seen a diabetes specialist and was "due to see eye doctor." Assessment included the previous diagnoses, plus decreased vision.

On February 17, 2003, Plaintiff's blood pressure was 180/110 (R. 183). It was noted that Plaintiff "went to Miami Friday" and forgot blood pressure medication. Plaintiff was apparently "going to NY today." It was observed that Plaintiff was "alert, coherent, no distress" with a strong grip. Plaintiff had returned from NY, and his blood pressure was 174/100 on March 10, 2003 (R. 182). On March 31, 2003, Plaintiff's blood pressure was 184/100, and it was noted that he had "ran out of BP Rx" and had "put in for retirement." (R. 181).

Plaintiff returned on April 21, 2003, with a blood pressure reading of 170/104 (R. 180). On June 2, 2003, he returned, noting some depression (R. 179). In addition to his usual regimen of medications, Zoloft was prescribed.

---

[10]The Commissioner argues in her brief that this notation indicates that Plaintiff had resumed working, as a nighttime driver to the Miami area. The ALJ did not make such a finding, however, and the Court believes this notation to be equally consistent with a finding that Plaintiff reduced the amount of sleeping pills he had been taking because the pills worked for 10-12 hours at night. The Court does not know what to make of the "drives to Miami area" comment. As the ALJ made a specific finding that Plaintiff did not engage in substantial gainful activity since his alleged onset date (R. 14) and did not cite to or rely upon the comment to support any finding, the significance of the comment is of no moment.

On June 6, 2003, a non-examining state agency physician completed a physical residual functional capacity assessment in which he opined that as of December 2001 (R. 164), Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently; could stand or walk about six hours and sit about six hours; and his ability to push and pull was unlimited, other than as shown for lift/carry (R. 165). Plaintiff was thought to have no visual limitations, and the only postural limitation was only occasionally climbing (R. 164-171).

On June 23, 2003, Plaintiff returned to Dr. Edwards, noting that he had been turned down for disability (R. 178). On examination, it was noted that he had a mild limp. Blood pressure was 130/74.

On July 14, 2003, Plaintiff returned to Dr. Edwards, noting that he had spent three weeks up north as his uncle and aunt had died (R. 177). On examination, it was noted that he was limping. Blood pressure was 124/87.

On August 4, 2003, it was noted that Plaintiff was "doing pretty good." (R. 176). Blood pressure was 141/84. On August 25, 2003, Plaintiff again noted back and neck pain, radiating into his leg (R. 174). It was noted that medicine makes the pain better and activity makes it worse. Dr. Edwards commented: "stagehand. big eater." (R. 175). Blood pressure was noted at 178/87, and Plaintiff was alert and coherent, in no distress and with normal speech and gait. Assessment continued to include chronic pain, AODM and HTN.

On September 15, 2003, Plaintiff returned to Dr. Edwards (R. 173). It was noted that he was walking stiffly, and "lowers self slowly onto chair." Seven prescriptions were prescribed. On October 6, 2003 visit, Plaintiff reported that he was sick to his stomach off and on, chronic, and it was noted that he "needs some more narco due to back pain." (R. 172). On examination, Plaintiff was

alert and coherent, and it was noted that he "holds back very stiff" and had a rocking limp. *Id.* Blood

pressure was 165/98. Assessment continued to be chronic pain back and neck; high blood pressure,

AODM, and s/p CABG x 5. Medications were increased.

On November 18, 2003, a non-examining state agency physician completed a Physical

Residual Functional Capacity Assessment in which he opined that as of December 2001 (R. 191),

Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently; could stand or walk about

six hours and sit about six hours; and his ability to push and pull was unlimited, other than as shown

for lift/carry (R. 192). Unlike the previous state agency opinion, this evaluator felt that Plaintiff could

frequently climb, but only occasionally balance, stoop or crouch (R. 193). It was felt that Plaintiff

should avoid hazards.

On December 4, 2003, a non-examining state agency psychologist completed a Psychiatric

Review Technique form in which she opined that as of that date,[11] Plaintiff had a mild affective

disorder, characterized by sleep disturbance and decreased energy (R. 199-212).

On December 16, 2003, Plaintiff was evaluated by consultative examiner Nitin Haté, M.D.

(R. 213-215). In the report, it is noted that Plaintiff last worked 10 or 12 years ago as a stage hand

(R. 213). On examination, Plaintiff's neck had muscle spasm, and his blood pressure was noted to

be 184/120. Gait was normal; toe and heel walking were partially accomplished and squatting was

50% accomplished. Straight leg raising was 50 for left and right, and 90 for left and right sitting.

Sensory testing was "generally" normal, and muscle and grip strength were normal. It was noted that

Plaintiff's ankle reflex was absent bilaterally. Range of motion was reduced in the thoracolumbar

spine. The only medical records reviewed were the operative report dated 8/28/2001 from Plaintiff's

---

[11]The assessment specified that it was for both date last insured and "current." (R. 199).

heart surgery (R. 215).  No laboratory testing was performed or reviewed.  *Id.*  Impression was status

post CABAG, stable, and "chronic pain in the lower lumbar area, knees and other weight bearing

joints, most likely degenerative joint disease age-related changes, also contributed by obesity." *Id.*

It was noted that Plaintiff was taking three different pain medications, and it was felt Plaintiff "may

have difficulty in strenuous activities, particularly repetitive stooping, squatting and lifting weights."

*Id.*

On December 31, 2003, a non-examining state agency physician completed a Physical

Residual Functional Capacity Assessment, for Plaintiff's then-current condition (R. 219).  He found

limitations consistent with the other non-examining physicians (R. 219-226).

On May 23, 2004, Plaintiff presented to the hospital, complaining of increased chronic back

and neck pain (R. 229-248).  His blood pressure was noted to be 182/111 (R. 236).  Plaintiff was

directed to follow up with a physician with respect to his blood pressure as soon as possible (R. 245).

Plaintiff ambulated with a steady gait to x-ray for testing (R. 241).   X-ray of the cervical spine

revealed "severe loss of disc space at all cervical disc levels except for C4-C5 indicating severe

degenerative disc disease." (R. 247).   It was noted that there was also "significant anterior and

posterior osteophyte formation at all cervical disc levels consistent with spondylitic changes." *Id.*

The lumbar spine series showed evidence of the prior surgery, with mild loss in disc space, suggestive

of minimal degenerative disc disease with mild spondylitic changes (R. 248).

On January 11, 2005, Plaintiff's physician wrote a note to whom it may concern, noting that

Plaintiff has a history of atherosclerosis with severe triple vessel disease including a left main

component, treated by quintuple coronary artery bypass (R. 227).  Dr. Edwards noted Plaintiff's past

myocardial infarction, and history of essential hypertension and adult onset diabetes mellitus.  He

stated that x-rays showed severe cervical degenerative disc disease, and noted Plaintiff's past lumbar laminectomy and spinal fusion, and that the disc degeneration had also affected Plaintiff's knees (R. 228).   Plaintiff was noted to have had "problems with anxiety, depression and insomnia" and suggested that an MRI would better evaluate the disc disease.  Plaintiff's diabetes was found to be "complicated by neuropathy" and pain, and it was noted that he walks with a marked limp and holds his head askew.  *Id.*

Plaintiff appeared at his hearing, with a non-attorney representative (R. 264).  Plaintiff testified that he has no money but survives with help from his daughter and by renting out a room in the house his mother left him (R. 268).  He once volunteered for the army, but was rejected due to his bad back (R. 268-9).  He testified that he does not drive because "he can't hardly see anymore" and he doesn't feel good (R. 269).  He stopped working in 1998 to take care of his ill parents and had a job lined up after they died, but he had a heart attack (R. 270-72).  He stated that he could not work now because of "my neck and my back basically" and Plaintiff repeatedly noted that he has not been able to go to other doctors because he has no money and no insurance (R. 272, 274, 277, 278, 284).

Plaintiff testified that due to his diabetes, he lost all of his teeth in three months (R. 272).  He stated that his heart seemed to be fine, and said he only had a little chest pain, and did not take any heart medicine for it (R. 273).  Plaintiff testified as to his back pain, noting that his back "kills me." (R. 274).  He testified that he can only afford to see one doctor - Dr. Edwards- and that Dr. Edwards told him that he could "die from the neck." (R. 274).  Specifically, Plaintiff testified that he could not return to work as an auto parts counter person because his doctor told him:

> I ain't got no bone.  He said if it wasn't for arthritis, my neck would fall, my head would fall off. (R. 276).

Plaintiff stated that he could not return to work because he could no longer lift and because his diabetes makes him tired and weak, and he can hardly walk anymore (R. 277).  He stated that his neck and back hurt all the time and he "can't get comfortable" sleeping (R. 279), and he stays in bed and watches TV most of the day (R. 280).

A vocational expert appeared and testified (R. 284).  The expert stated that auto parts counter clerk is light level work, and a hypothetical person in his mid-50's with a high school plus education and ability to lift 20 pounds occasionally, 10 pounds frequently, with occasional postural limitations and the need to avoid hazards could perform the job, as it is performed in the national economy (R. 285-6).  The VE testified that no job exists if the person has to spend a lot of the day in bed (R. 286), nor if a person can only stand for 5 or 10 minutes at a time (R. 287).

Plaintiff also completed several questionnaires regarding his allegations of pain and limitation. Plaintiff stated that he was "unable to bend from, the waist, unable to sit/stand without pain" and had "shooting pains down left leg " (R. 73).  He felt that he was able to sit for 45 minutes at a time, stand for 1 hour and walk for 10 minutes (R. 75), and describes his pain as "excruciating" and "constant" (R. 89).  With respect to cardiac limitations, he stated that he had chest pain with exertion, which was controlled normally by rest (R. 76).  As for his diabetes, Plaintiff stated that he is on a special diet and takes Glucotrol twice a day (R. 80).  He experiences nausea frequently, and has had vision problems, dental problems and "no energy." *Id.*

The ALJ found that Plaintiff had the severe impairments of status post CABG times five; status post spinal fusion, 1976; and degenerative disc disease, back and knees, but that Plaintiff's hypertension, diabetes, depression and anxiety were not severe impairments (R. 15,19).  The ALJ found Plaintiff's allegations of pain to be not totally credible, accepted the state agency physician's

residual functional capacity assessment and found that Plaintiff was able to return to his past relevant work, and was therefore not disabled (R. 19).

### STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.   *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.   *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.   *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### ISSUES AND ANALYSIS

Plaintiff contends that the "Administrative Law Judge, in finding that the Plaintiff was not disabled pursuant to the Social Security laws and regulations, and in finding that the Plaintiff was capable of performing his past work as an auto parts counter-person, did not base his decision on the substantial evidence of record and/or erred as a matter of law." (Doc. No. 22 at 20). The Court agrees.

**The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f). While this case was determined at step four, the Court finds error at step two.

An impairment is not severe if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Brady v. Heckler,* 724 F. 2d 914, 920 (11th Cir. 1984). As noted by the Eleventh Circuit:

> Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would

-14-

clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  Claimant need show only that her impairment is not so light and its effect is not so minimal.

*McDaniel v. Bowen,* 800 F. 2d 1026, 1031 (11th Cir. 1986).

Here, the ALJ found that Plaintiff's hypertension, diabetes, anxiety and depression were not severe impairments.  With respect to Plaintiff's hypertension and diabetes, this was error.

As set forth above, the record is replete with references to Plaintiff's high blood pressure, and establishes that his pressure was usually high, even while on medication.[12]  All of Plaintiff's physicians, including his cardiologist, noted the hypertension, and the need to get the blood pressure under control.  In view of Plaintiff's cardiac history, which includes a heart attack and *quintuple* bypass surgery, a finding that Plaintiff's hypertension is not a severe impairment, and thus "trivial" and "so slight and so minimal that it would clearly not be expected to interfere" with the ability to work, is simply not supported by substantial evidence.  *See Flynn v. Heckler,* 768 F. 2d 1273 (11th Cir. 1985) (reversing a decision which found hypertension not severe at step two).

Likewise, although the record establishes that Plaintiff had adult onset diabetes, the ALJ found that it was not a severe impairment because "the claimant had no clubbing, cyanosis, or edema" and "There are no laboratory records and Dr. Edwards had not prescribed the claimant any medication for diabetes mellitus." (R. 15).  This rationale is not supported by substantial evidence.  As set forth

---

[12]The ALJ stated, as one of his reasons for rejecting hypertension as a severe impairment, that "Dr. Edwards made note on most office records that the claimant needed to take his medication as prescribed, which indicated that the claimant was not taking his medication as prescribed." (R. 15).  There is no support for this conclusion.  The Court notes that Dr. Edward's often used a form for his treatment notes, which contained the pre-printed notation "Take medication as prescribed." (*see, e.g.,* R. 172, 173, 176).  As Dr. Edwards had his patient sign the treatment notes, it is more likely that this is a standard instruction to all patients, and not a finding that a patient was not taking his or her medications.

above, as early as September 2001, Plaintiff was placed on Glucotrol,[13] and advised to see a diabetes doctor.  He testified repeatedly that lack of funds and insurance prevented him from doing so. Nonetheless, his sugar levels were checked at the Family Medical Center, and Plaintiff was given an AccuCheck blood sugar monitor to check his sugars at home (R. 157).  Contrary to the ALJ's finding, the record shows that Dr. Edwards also prescribed Glucotrol for Plaintiff (R. 190).  While Plaintiff may not have had clubbing, cyanosis or edema as a result of his diabetes, the  record indicates other complications, such as vision loss, fatigue, and nerve damage (neuropathy), reported by Dr. Edwards. While the record may not support a finding that Plaintiff's diabetes was disabling, this is not the inquiry at step two.  Diabetes, especially in a hypertensive patient with a history of heart attack and severe triple vessel heart disease, may be managed and controlled, but rarely qualifies as "trivial." On this record, a finding that Plaintiff's diabetes is not a severe impairment is not supported by substantial evidence.

In addition to improperly evaluating these impairments, the Court finds error in the ALJ's failure to note the severe degenerative cervical disc disease as a severe impairment.  Although the ALJ mentions the 2004 X-ray revealing severe disease, with spondylitic changes in Plaintiff's neck, he finds only that the degenerative disc disease of the back and knees is a severe impairment.  In view of this strong and uncontradicted evidence, coupled with Plaintiff's repeated complaints of neck pain and medical findings of limitations in his range of neck motion summarized above, the failure to consider this impairment is reversible error.  *See Williams v. Barnhart,* 186 F. Supp.2d 1192, 1198 (M.D. Ala. 2002) (failure to address the severity of alleged impairments was reversible error).

---

[13]Glucotrol is a medicine to help control blood sugar levels, used to treat Type II diabetes. http://www.drugs.com/glucotrol .

As this Court finds that the ALJ erred in not including these impairments at step two of the analysis, it follows that the decision  must be reversed for further consideration.  This is especially so in view of the requirement that the ALJ consider the combined effect of all impairments.

As noted by Plaintiff, the law requires the ALJ to consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir.1987).   Where there is more than one impairment, the claimant may be found disabled even though none of the impairments, considered individually, would be disabling. *Walker*, 826 F.2d at 1001; *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having severe hypothetical and isolated illnesses.   *Davis*, 985 F.2d at 534.  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled.  *Id.*. Here, the failure to evaluate hypertension and diabetes past step two and to evaluate the severe cervical disc disease at all renders the ALJ's decision defective on this point, as well.  On remand, the ALJ must consider the combined effect of all impairments, as required by law.

**Pain**

The Court also finds that the ALJ's finding with respect to pain and credibility are not sufficiently supported.  Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

**Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).   A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the ALJ discredited Plaintiff's allegations of pain and credibility by finding that "the objective findings and medical treatment do not support the claimant's reported disabling limitations." (R. 17).  The ALJ's explanation, however, is not supported by substantial evidence.  The ALJ notes that Plaintiff has not undergone an epidural block, does not wear a back brace or TENS unit, has had

no physical therapy and has been maintained on only medication for relief of his pain (R. 17).  While this is true, there is no record evidence that any of the treatments cited were appropriate for Plaintiff or would have successfully treated his pain better than the various medications prescribed; nor is there any evidence that these treatments were, in fact, prescribed for Plaintiff, but Plaintiff did not comply. An ALJ "may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional." *Marbury v. Sullivan,* 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring specially).  Moreover, Plaintiff repeatedly noted (and there is no record evidence to the contrary) that he had no insurance and no money to pay for specialized treatment.  This circuit has held that poverty excuses noncompliance with treatment, and the burden on proving unjustified noncompliance is on the Commissioner.  *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988).  On this record, an inference that Plaintiff is not *really* in pain as he is not undergoing other treatments that have never been prescribed or otherwise shown to be appropriate or effective for him, is not supported by substantial evidence.

As for the treatment Plaintiff was undergoing, while the ALJ notes that Plaintiff was maintained only on medication, he does not note that Plaintiff was maintained on a substantial level of potent, narcotic pain medication, so much so that Dr. Haté suggested that this be re-evaluated, due to the likelihood of dependence (R. 215).  A finding that Plaintiff is dealing with chronic pain "only" with powerful medication does not support an inference that the pain is therefore not disabling.

The ALJ next notes Dr. Haté's report that Plaintiff had a normal gait and station, and did not use any assistive devices (R. 17).  While the ALJ focuses on Dr. Haté's opinion, apparently in an attempt to establish that Plaintiff's pain was not severe, such a conclusion is not supported by the

report. As noted by the ALJ, Dr. Haté concluded that Plaintiff did, indeed, have chronic pain and would have difficulty with strenuous activity, including lifting weight.[14]

Application of the pain standard indicates that Plaintiff suffered several conditions, including the cervical disc disease, the severity of which is confirmed by objective x-ray evidence. The record establishes that Plaintiff took an enormous amount of pain pills, and was seeing a pain specialist who validated the severity of his conditions. A credibility finding that Plaintiff's reported limitations are not supported by objective findings and medical treatment is, itself, not supported by substantial evidence.

The ALJ erred in failing to consider Plaintiff's hypertension, diabetes and severe cervical degenerative disc disease, at step two and in combination with his other acknowledged impairments, for the rest of the disability evaluation sequence. Moreover, the pain and credibility findings are not supported by substantial evidence and must be reconsidered, in light of all of the impairments, and the proper legal standards.

### CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the decision of the Commissioner is not supported by substantial evidence and was not made in accordance with proper legal standards. As such, it is **respectfully recommended** that the decision be **REVERSED** and the matter

---

[14]The ALJ discredited the weight lifting limitation of Dr. Haté's report as being inconsistent with the medical evidence (R. 18). Due to the conclusions herein, the Court need not address this particular finding, save for noting that Dr. Haté did not review any of the pertinent medical records, save for the heart surgery operative report.

**REMANDED** for further proceedings, consistent with this Report.[15] Should this recommendation be adopted, the Clerk should be directed to enter judgment, terminate all matters and close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on October 19, 2006.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy

_____

[15]The Court notes that Plaintiff was only insured to December 2001, and that his application for SSI was not made until 2003. Should the District Court adopt this recommendation of remand, the ALJ should specifically address these two time periods, as it may well be that, due to the progressive nature of some of Plaintiff's impairments, Plaintiff's condition may have changed.